## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

———————————————————————————

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

           Plaintiff,

           v.

LOREN W. HOLZHUETER, and ISC, Inc.
(d/b/a Insurance Service Center),

           Defendants, and

HONEFI, LLC,

           Relief Defendant.

———————————————————————————

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 15-cv-45

JURY DEMANDED

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows:

1.      This case centers on a fraudulent scheme perpetrated by Defendant Loren W. Holzhueter and the insurance brokerage business that he owns and controls – ISC, Inc., d/b/a Insurance Service Center ("ISC").

2.      Holzhueter has long worked as an insurance broker and provider of tax and accounting services in the area in and around Watertown and Oconomowoc, Wisconsin. Over the years, Holzhueter has built relationships of trust in the communities he served. Many of his clients have used him for tax and insurance services for decades. Often Holzhueter provided services to multiple members of the same extended family. Holzhueter was adept at generating business amongst the local farming community in the greater Watertown area and he attended the same church as some of his clients.

3.      From at least January 2008 through November 2014, Holzhueter has exploited his network of clients, business associates and friends to recruit investors for ISC. Holzhueter has been enormously successful in this effort; from January 2008 through November 2014, he raised at least $10.4 million from approximately 122 investors.

4.      But, in raising funds for ISC, Holzhueter and ISC have (a) lied to prospective investors about the nature of their investment and the use of their funds, and (b) operated a classic Ponzi scheme – using funds from new investors to pay returns to old investors.

5.      In persuading his victims to invest in ISC, Holzhueter told a wide array of lies. Holzhueter told some investors that their investments would be placed in a separate investment account at ISC and that they could withdraw their funds at any time. Holzhueter told other investors that their money would be invested in mutual funds or bonds. He told some investors that their investment would be placed in an Individual Retirement Account ("IRA") or a similar tax-deferred account. Holzhueter offered other investors so-called "promissory notes" that he said would be used to "grow ISC's business" and/or expand ISC's operations through the acquisition of other insurance agencies.

6.      None of the forgoing representations was true. In reality, Holzhueter and ISC deposited investor funds directly into ISC's general bank accounts and used investor funds to (a) fund ISC's payroll and general operations, (b) pay off ISC's existing bank debts, and (c) make payments to Holzhueter and entities under his control.

7.      In addition, Holzhueter and ISC hid four critical pieces of information from his most recent investors: that (a) at least as of 2012, Holzhueter and ISC were engaging in a Ponzi scheme – *i.e.*, a portion of the amounts raised from new ISC investors were being used to make interest and principal payments to previous ISC investors, (b) in November

2013, ISC had its records seized by the Internal Revenue Service, Criminal Investigative Division ("IRS-CI") pursuant to a search warrant, and (c) ISC raised new investor funds and paid at least $637,000 from the account where investor funds were kept to Holzhueter's and ISC's defense attorneys –to make settlement payments to a redeeming investor.

8.     By making material misrepresentations and omissions to ISC investors, and by engaging in a fraudulent Ponzi scheme, Holzhueter and ISC have committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]. In addition, Defendant Holzhueter is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the violations by ISC identified herein.

9.     ISC benefited from defrauding its investors – it had use of at least $10.4 million of investor funds.

10.     In addition to keeping his business afloat with investors' money, Holzhueter personally benefitted from defrauding investors in ISC. Specifically:  (a) out of the accounts where investor funds were comingled with other ISC revenue, Holzhueter and his family personally received over $511,000 in investor funds from ISC; (b) ISC used $230,000 of investors' cash to pay off a loan owed by Relief Defendant Honefi, LLC ("Honefi") – an entity that Holzhueter controls and owns with his wife; (c) ISC paid approximately $166,350 from accounts in which investor funds were kept to Honefi; and (d) used some investor funds to make payments on ISC debts that Holzhueter had personally guaranteed.

11.     The SEC brings this lawsuit to halt Defendants' ongoing violations of the federal securities laws, to prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

## JURISDICTION AND VENUE

12.     The SEC brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)].

13.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

14.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Western District of Wisconsin.

15.     Defendants Holzhueter and ISC reside and conduct business within the Western District of Wisconsin.

16.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

17.     **Loren W. Holzhueter**, age 69, is a resident of Jefferson County, Wisconsin. Holzhueter is the president, Chief Executive Officer ("CEO"), majority owner and registered agent of Defendant ISC, and is part-owner and managing member of Relief Defendant Honefi.

18.     **ISC, Inc.**, is a Wisconsin corporation formed in 1985 and headquartered in Watertown, Wisconsin. ISC is an insurance brokerage – owned and controlled by Defendant Holzhueter – that sells homeowners, auto, farm, and life insurance policies and the investments described in this lawsuit. ISC has at least 12 offices – operating under various names – throughout the State of Wisconsin.

## RELIEF DEFENDANT

19.     **Honefi, LLC** is a Wisconsin limited liability company with its principal place of business in Watertown, Wisconsin. Holzhueter owns Honefi along with his wife and controls its operations.

## FACTS

### Background:

20.     Loren Holzhueter is a longtime resident of Jefferson County, Wisconsin and has worked in the area of Oconomowoc and Watertown, Wisconsin for at least the past 30 years.  He has owned a tax preparation business, Quality Tax and Accounting Services, LLC ("Quality Tax"), since 1985.

21.     In the 1990s, Holzhueter joined the Watertown-based insurance brokerage ISC which sold a wide array of insurance policies. After joining ISC, Holzhueter continued to offer tax services through Quality Tax.

22.     Prior to being acquired by Holzhueter, ISC had five offices, approximately 30 employees, and carried little or no debt.  It was funded by its owners and through its ongoing operations; it did not solicit investments or loans from clients to support its operations.

23.     In 2004, Holzhueter purchased ISC from its original owner.  Since that
purchase, Holzhueter has been ISC's President and majority owner. At all times since that
purchase, ISC has been controlled and operated by Holzhueter.

24.     After purchasing ISC, Holzhueter attempted to expand its operations. ISC
grew to 12 offices throughout Wisconsin, often by acquiring other insurance agencies.
Between 2011 and 2012 alone, ISC's payroll grew from $900,000 for 28 employees to $2.1
million for 54 employees.

25.     As ISC's operations expanded, its operating income was not enough to keep
up with the company's expenses. ISC, therefore, took on debt from its custodian banks.

26.     According to ISC's internal financial statements, as of June 30, 2010, ISC
owed over $183,000 on a line of credit extended by its custodian bank and had a negative
cash balance in its general account of over $270,000.

27.     ISC's bank debt expanded in 2011. According to ISC's internal financial
statements, by August 31, 2011, it had an outstanding balance of $169,385 on the line of
credit, had taken out a new bank loan with an outstanding principal balance of over
$388,115, and had a negative cash balance in its general account of $432,896.97.

**Holzhueter Raises Money From Investors:**

28.     ISC's bank debt was not enough to fund ISC's operations. As Holzhueter
expanded ISC's offices and payroll and took on additional bank debt, he also raised money
from individuals – including many clients of his insurance and tax preparation business.

29.     Holzhueter encouraged people who trusted him to invest their money with
ISC. Many of ISC's investors are family, friends, and tax and insurance clients that
Holzhueter has known for years – sometimes decades.  Holzhueter gained some investors'

trust because he does their taxes and sells them insurance products, so he has an understanding of their personal finances.  Holzhueter met other investors because he had a considerable client base among the local community.

30.     From at least January 2008 through November 2014, Holzhueter raised at least $10.4 million from at least 122 investors.  Some of the investors Holzhueter recruited are retired and have modest or limited financial resources.

31.     Holzhueter told certain investors that they were opening investment accounts with ISC.   He told other investors that he would use their funds to expand ISC's business by purchasing other insurance agencies or buying out his business partners.

32.     In exchange for their investments, Holzhueter and ISC offered investors a guaranteed fixed-rate of return.  Depending on the investor, Holzhueter offered a guaranteed return usually ranging from 2% to more than 8% – which was in excess of the then-prevailing rates for bank deposits, CDs and other fixed-return investment vehicles.

33.     Holzhueter often portrayed this as a liquid investment; he often assured investors that they could redeem their investment or withdraw some of their principal at any time. He told others that – rather than receiving monthly interest payments by check – they could "reinvest" the interest by leaving it in their ISC account.

34.     Holzhueter was the primary contact for individual investors in ISC. Holzhueter typically communicated with investors in person or on the phone and received investment funds from clients by check during face-to-face meetings.  ISC sent many investors their purported interest payments through the U.S. Mail.

35.     The investments that Holzhueter solicited in ISC were documented in various ways. For some investors, Holzhueter created a "Promissory Note" that was provided to the

investor. The "Promissory Note" typically identified the principal amount, the annual interest rate and maturation date.

36.     In other instances, Holzhueter provided the investor with a signed receipt, prepared on a form document bearing ISC's name that he signed. The receipts indicated that the funds were an investment and identified the date of the investment and, in some instances, indicated the interest rate to be paid and the frequency of the interest payments. Holzhueter met with these ISC investors periodically to apprise them of their account performance, sometimes in conjunction with a review of their tax returns.  He provided most of these investors with summaries of their account performance on ISC letterhead. These so-called "Summary Sheets" indicated the investor's name, the amount invested, date(s) of investment, and the total balance as of a given date.  Some Summary Sheets also indicate the interest rate. To support the summaries, Holzhueter often provided so-called "transaction details" or an "Interest / Earnings Statement."

37.     All of the ISC investments – regardless of how they were documented – are "securities" as that term is defined in Exchange Act Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] and Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

**Holzhueter's Misrepresentations and Omissions to ISC Investors:**

38.     In the course of convincing investors to invest their money with ISC, Holzhueter made several material misrepresentations and omissions about the nature of the investment. Specifically, Holzhueter: (a) falsely told a number of investors that their money would be placed in segregated investment accounts, (b) falsely told certain investors that their funds were invested in mutual funds or bonds, (c) falsely told several investors that

their funds were invested in a tax-deferred account, and (d) falsely told a number of other investors that he was raising funds to "buy out" the widow of a former business partner.

39.     In addition, Holzhueter failed to tell investors the truth about how their funds would be used. While ISC, indeed, used some of the amounts Holzhueter raised from investors to fund the expansion of ISC, that was not the only way investor funds were used. Investor funds were deposited into ISC's general accounts – where they were intermingled with other revenue – and ISC used these funds to (a) fund general operations; (b) fund payroll for ISC's employees; (c) make payments to Holzhueter and entities under his control; (d) pay ISC's existing bank debt; (e) pay Honefi's bank debt; (f) make Ponzi scheme payments to earlier investors as purported interest payments earned on their investments, or to redeem all or part of their principal investments; and (g) make payments to Holzhueter's and ISC's defense attorneys with the aim of making settlement payments to a redeeming investor.

40.     Finally, Holzhueter failed to inform those who invested after November 2013 that IRS-CI was investigating him or that the IRS-CI had seized ISC's records pursuant to a search warrant.

**Holzhueter Lied About the Nature and Risks of the ISC Investment**:

41.     From 2008 through November 2014, Holzhueter led many prospective ISC investors to believe that their investments would be placed in separate investment accounts and that they could withdraw their funds at any time.

42.     He told some of these investors that the funds placed in these separate investment accounts were invested in mutual funds, bonds or other secure investments.

43.     For example, Holzhueter – acting through ISC – led at least two investors to believe that (a) they were opening up a separate investment account invested in mutual funds and (b) were opening a separate Uniform Gift to Minor Account for each of their four children.

44.     Starting in June 2012, Holzhueter and ISC successfully convinced a married couple ("Investors A&B") to make an investment with ISC.  Investors A&B invested funds they received by redeeming accounts at another brokerage. They told Holzhueter that they would use this investment for their retirement (the "Retirement Funds"). They invested the proceeds of these redemptions with ISC beginning in June 2012.

45.     Holzhueter told Investors A&B that their Retirement Funds would be placed in a separate investment account at ISC. He even asked them how he should title the ISC account that held the Retirement Funds.

46.     In July 2012, Investors A&B invested additional funds with ISC for their children's education. Holzhueter assured Investors A&B that these funds would be invested in Uniform Gift to Minor Accounts ("UGMAs") that would allow funds to be applied toward the education of their children. A UGMA is a tax-advantaged account that allows parents to act as custodian for an account in their child's name, and allows the custodian to make withdrawals for limited purposes (including education) until the child turns 21, at which point the child is given full control of the account.

47.     Although Holzhueter never fulfilled his promise to place Investor A&B's investment in a separate account or to open any Uniform Gift to Minor Accounts for their children, Holzhueter attempted to maintain that illusion. For example, during two meetings in the second half of 2013, Holzhueter provided Investors A&B with handwritten notes and

a "Summary Sheet" indicating their funds were invested in separate accounts that had been growing at a rate of at least 5%. He also told them that the Retirement Funds were invested in mutual funds and other similar securities.

48.     During these same two meetings, Holzhueter led Investors A&B to believe – through both oral representations and a document Holzhueter provided Investors A&B – that the investment for the benefit of their children was in a separate account.

49.     Holzhueter also told several other investors that their separate investment account would be a tax deferred account (such as an IRA, 401(k), or similar tax-deferred vehicle).

50.     For example, in November 2012, Holzhueter recommended that one of his clients, "Investor C," roll over his IRA account at another brokerage to an investment account at ISC.  Investor C agreed and invested over $97,000 of his retirement savings with ISC.

51.     Holzhueter told Investor C that his account at ISC would be a Simplified Employee Pension Individual Retirement Account ("SEP-IRA") or similar tax-deferred account that Holzhueter would manage.  Holzhueter told Investor C he could get his money back at any time.

52.     Holzhueter provided Investor C with Summary Sheets showing that his investment earned 5.2%, but did not disclose where the funds were invested or what the underlying securities were.

53.     Instead of rolling Investor C's investment into a tax-sheltered SEP-IRA, ISC deposited $97,076.38 of Investor C's savings into an ISC checking account that had a $0 balance.  Within ten days, Investor C's funds were entirely dissipated. Instead of

maintaining Investor C's funds in a tax-deferred account, Holzhueter and ISC used Investor C's money, among other things, to (a) fund ISC's general business operations, (b) make over $33,000 in payments to meet ISC's payroll, (c) pay approximately $7,500 to one of ISC's lenders and (d) transfer $7,000 to Holzhueter and Honefi.

54.     Investor C subsequently invested $5,449 in January 2013 and $38,500, in April 2013, $16,000 of which was to be deposited into his tax-deferred account for tax year 2012.  Investor C's $5,449 investment was instead deposited into an ISC checking account with a $0 balance and was used the same day to fund cashier's checks payable to Holzhueter.  Investor C's $38,500 investment was deposited into an ISC checking account with a $0 balance and was dissipated the same day to fund, among other things, payments on ISC's bank loan, bank fees, and payments to other investors.

55.     Between January 2008 and November 2014, Holzhueter – acting through ISC – told other investors that their funds were being used to finance ISC's expansion, including the acquisition of specific insurance businesses.

56.     The representations identified in Paragraphs 38-55 were false when made. In reality:

(a)     As to Investors A&B and similarly situated investors, Holzhueter and ISC did not place investor funds in separate investment accounts of any kind – and specifically did not place investor funds in Uniform Gift to Minor Accounts;

(b)     As to Investors A&B and similarly situated investors, none of investors' funds were invested in mutual funds, bonds or any similar investment vehicle;

(c)     As to Investor C and similarly situated investors, Holzhueter and ISC did not place investor funds into a SEP-IRA or similar tax-deferred account; and

(d)        Holzhueter and ISC did not use investor funds exclusively to expand and/or finance the acquisition of other insurance agencies.

57.    Instead of investing the amounts raised as they represented to investors, Holzhueter and ISC took investors' cash and placed it directly into ISC's operating accounts. While a portion of the invested funds was used to purchase other insurance agencies as part of ISC's expansion, Holzhueter and ISC used investor funds for other purposes, including to meet ISC's payroll, to pay off ISC's bank loans, and to make payments to Holzhueter and his family. Moreover, as alleged in paragraphs 71-79 below, investor funds also were used to perpetuate a Ponzi scheme (*i.e.*, new investor funds were used to make interest and principal payments to old investors).

58.    Each of the misrepresentations identified in paragraphs 38-55 above were material. In making an investment decision, a reasonable investor would deem it important that:

(a)        instead of placing the investors' funds in a segregated investment account that the investor could access at any time, Holzhueter and ISC fed investor funds directly into ISC's general accounts where they were intermingled;

(b)        instead of placing investor funds into an IRA or similar tax deferred account, funds were sent to ISC's general accounts;

(c)        instead of investing in mutual funds and/or other conservative investments, at best, all investor funds were invested in a small, private insurance agency (ISC) with a heavy debt load; and

(d)        instead of solely using investor cash to fund ISC's purchase of insurance agencies, portions of investors' principal were used to (i) satisfy ISC's payroll, (ii) make payments on ISC's existing bank debt, (iii) make payments to Holzhueter and other entities Holzhueter's owned and (iv) engage in a Ponzi scheme (*i.e.*, use new investor cash to make interest and principal payments to earlier ISC investors).

59.     In making the misrepresentations and omissions identified in paragraphs 38-55 above, Holzhueter and ISC acted with scienter. At the time he told prospective investors about the nature of their investment, Holzhueter knew – or recklessly disregarded – that the representations in paragraphs 38-55 above were not true.

**Holzhueter Lied about Raising Money to Buy Out Former Partners**:

60.     As alleged in paragraph 31 above, Holzhueter often told investors that their investment would be used to finance the purchase of other insurance agencies. After May 2014, he began to tell investors that he needed funds for the purchase of a specific agency located in Beaver Dam, Wisconsin.

61.     Specifically, by May 2014, Holzhueter began telling potential investors that he needed additional cash to buy out a former business partner's ownership interest in a Beaver Dam insurance agency.  Holzhueter told several prospective investors that his "partner" in Beaver Dam, had died suddenly, and that he needed to buy-out the former partner's widow.  He told other investors that he needed the money to provide financial assistance to the widow.  He told some of these investors he needed to raise between $200,000 and $250,000 for these purposes.

62.     Holzhueter's story was false. In fact, Holzhueter and ISC already had purchased the ownership interest in the Beaver Dam office and had completed payments due to the former owner's widow under the purchase agreement months earlier -- in January 2014.  Moreover, neither the original owner of the Beaver Dam agency nor his widow has ever sought financial assistance from ISC or Holzhueter.

63.     The misrepresentations described in paragraphs 60-61 above were material. In making decisions regarding their investments, a reasonable investor would find it

important that their investment was not being used as represented – *i.e.*, to finance the further expansion of ISC – but rather was being placed into ISC's general accounts and used to keep ISC operating.

64.     In making the misrepresentations identified in paragraphs 60-61 above, Holzhueter and ISC acted with scienter. At the time he informed prospective investors that their investment would be used to fund the outstanding balance of the purchase price of the Beaver Dam agency, Holzhueter knew that ISC's purchase was already complete and that investor funds would instead be placed in ISC's general accounts.

**Holzhueter Failed to Disclose to Prospective Investors that He is the Subject of an IRS Investigation:**

65.     Defendant Holzhueter has been the subject of a criminal investigation of the IRS-CI. According to an unsealed November 4, 2013 search warrant affidavit, Holzhueter is being investigated for potential violations of federal law, including mail fraud, wire fraud, and money laundering.

66.     In November 2013, the IRS-CI executed a search warrant at ISC's headquarters in Watertown. In connection with that search, IRS agents seized electronic media, customer files, bank records and other financial records both in paper and electronic form.

67.     After the November 2013 search, Holzhueter – acting through ISC – continued to raise money from investors. From November 2013 to the present, Defendants raised approximately $2.8 million from 46 investors.

68.     After November 2013, Holzhueter and ISC did not tell all of his current and prospective investors that Holzhueter was under investigation by the IRS-CI and that ISC's records had been seized during a search of its headquarters.

69.     This was a material omission. Before investing in ISC's expansion – an investment presumably dependent on ISC's ability to generate revenue – a reasonable investor would consider it important that (a) the person who controlled ISC was under criminal investigation, and (b) the company at the heart of the investment had been the subject of a search and seizure conducted by agents of the IRS-CI.

70.     In making the material omissions identified in paragraphs 65-68 above, Holzhueter and ISC acted with scienter.  Holzhueter was present during the search of ISC's headquarters by the IRS-CI in November 2013. At the time he solicited and accepted investments in ISC after November 2013, Holzhueter knew that he was under investigation by the IRS-CI and that ISC's computers and records had been seized during a search of its headquarters.

**Holzhueter Operates ISC As A Ponzi Scheme**:

71.     As ISC's expansion continued, its financial condition deteriorated. For example – according to ISC's internal financial statements – in the first eight months of 2011, ISC had a net loss of $182,151.61 and, as of August 31, 2011, had current assets of ($230,998.18). By the end of June 2013, ISC had only $554 in its general accounts.

72.     Although he raised more than $3.2 million from investors after June 2013, ISC continued to burn through its cash. By the end of October 2014, ISC had just over $19,500 left in its general accounts.

73.     To meet his mounting obligations to pay interest and principal to investors, Holzhueter and ISC engaged in a fraudulent Ponzi scheme; they used money raised from new ISC investors to pay off interest obligations and principal redemptions owed to ISC's existing investors.

74.     For example, Investors A&B demanded that Holzhueter return the funds they invested with ISC. Holzhueter met this redemption request by paying Investors A&B a total of $140,000 by checks dated February 4, 2014. To make those payments, Holzhueter used new investor proceeds that had been deposited on January 22, 2014.

75.     Holzhueter and ISC also diverted investor funds through their defense attorneys to make settlement payments to a redeeming investor. For example:

(a)     On March 17, 2014, ISC received $55,000 from an investor. On the same day, Holzhueter purchased a $55,000 cashier's check drawn on an ISC bank account payable to ISC. In turn, Holzhueter cashed that cashier's check on March 28, 2014 to make up part of the purchase price of a $75,000 cashier's check payable to ISC's and Holzhueter's defense counsel;

(b)     On March 25, 2014, ISC received $275,000 from investors and, just three days later, Holzhueter purchased a $325,000 cashier's check using funds from ISC's bank account, payable to ISC's and Holzhueter's defense counsel;

(c)     On April 21, 2014, ISC received $40,000 from an investor and, on the same day, Holzhueter purchased a $40,000 cashier's check using funds from ISC's bank account that was then endorsed over to ISC's and Holzhueter's defense counsel;

(d)     On May 5, 2014, ISC received $6,000 from an investor and deposited it in ISC's account. Two days later, a $5,000 check payable to ISC's and Holzhueter's defense counsel cleared the same account; and

(e)     On May 27, 2014, ISC received funds from two investors: one investment of $125,000 and another investment of $50,000. The same day, Holzhueter bought two cashier's checks that he endorsed over to ISC's and Holzhueter's defense counsel: one for $125,000 and one for $50,000.  These investors' funds were deposited into the ISC account that Holzhueter used to fund the cashier's checks.

76.     In total – including the $620,000 payments identified in paragraph 75(a)-(e) – Holzhueter and ISC transferred approximately $637,000 to ISC's and Holzhueter's defense counsel between March 2014 and May 2014.

77.     The transfers of $620,000 of investor funds to ISC's and Holzhueter's defense counsel identified in paragraph 75(a)-(e) were then used to make two settlement payments – totaling $620,000 – to redeem an investor in ISC who was demanding a return of principal.

78.     Holzhueter did not disclose to prospective investors in ISC that a portion of their investments could be used to make principal and interest payments to earlier investors or to complete settlement payments to investors seeking to redeem their investment.

79.     Holzhueter and ISC have continued to raise funds from investors and continued to operate a Ponzi scheme to meet their interest and principal obligations. Since May 2014, ISC has received approximately $1.7 million in new investments from at least 32 investors. Rather than use the $1.7 million as represented, Holzhueter and ISC have used the majority of those funds to perpetuate their Ponzi scheme and for Holzhueter's personal benefit. Of the $1.7 million raised, approximately $1.4 million was used to make interest and principal payments to other investors, and approximately $103,000 was transferred to Holzhueter and entities under his control.

**Holzhueter Transfers Investor Funds to Honefi:**

80.     In addition to using investor assets to pay off obligations to old investors and to pay himself, Holzhueter also used investor funds to pay obligations of another entity that he controls – Honefi.

81.     In June 2010, Honefi repaid a $638,464.54 bank loan.  ISC repaid a portion of Honefi's loan from ISC's accounts. In doing so, ISC used at least $230,000 of investor funds to pay down Honefi's debt.

82.     In addition, between April 21, 2009 and November 10, 2014, ISC made payments to Honefi – out of the accounts into which investor funds were comingled with other ISC revenue – totaling $166,350.

83.     The proceeds identified in paragraphs 81-82 are the proceeds of the violations committed by Defendants Holzhueter and ISC described in this Complaint.

84.     Relief Defendant Honefi has no legitimate claim to the amounts received from ISC identified in paragraphs 81-82.

**The Ponzi Scheme Runs Out of Cash**:

85.     Holzhueter's payments to investors were, ultimately, unsustainable. Even as he continued to raise hundreds of thousands of dollars from investors every month, ISC's financial situation remained grim.

86.     Even though ISC received over $400,000 from investors in October 2014 – on top of its normal operating revenue – by the end of October 2014, ISC had only $19,592.83 in cash remaining in its general accounts.

87.     Holzhueter raised an additional $253,000 from investors in just the first three weeks of November 2014. Yet, by the end of November 2014, ISC had only $30,807.95 in its general accounts.

88.     Notwithstanding Holzhueter's continued solicitation of investments for ISC, on December 1, 2014, ISC's bank sent Holzhueter a "Notice of Default," stating that ISC had defaulted on a $150,000 line of credit with the bank.

89.     Although he had promised investors that they could access their principal and get access to their money at any time, Holzhueter is now delaying or refusing to make payments demanded by worried investors.

**Holzhueter Invokes the Fifth Amendment in Response to Questions Posed by the SEC:**

90.     As part of its investigation into the securities law violations identified in this Complaint, the SEC issued an investigative subpoena to Holzhueter requiring him to appear and provide testimony under oath to the SEC regarding the funds he raised from investors.

91.     At Holzhueter's December 3, 2014 investigative testimony, the SEC asked Holzhueter questions about ISC, including questions about: (a) Holzhueter's representations to prospective investors; (b) Holzhueter and ISC's use of funds raised from investors; (c) ISC's financial condition; (d) Holzhueter's transfer of investor funds to himself, his family and entities under his control; and (e) Holzhueter and ISC's use of new investor funds to pay off earlier investors.

92.     Holzhueter refused to answer any of the substantive questions posed by the SEC and invoked his right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

## COUNT I
### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5
### (Against Holzhueter and ISC)

93.     Paragraphs 1 through 92 are realleged and incorporated by reference.

94.     As more fully described in paragraphs 38 through 79, Defendants Holzhueter and ISC, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as

a fraud and deceit upon purchasers and prospective purchasers of securities.

95.     As described in more detail in paragraphs 38 through 79 above Defendants acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

96.     By reason of the foregoing, Defendants Holzhueter and ISC violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II
### Violations of Section 17(a)(1) of the Securities Act
### (Against Defendants Holzhueter and ISC)

97.     Paragraphs 1 through 92 are realleged and incorporated by reference as though fully set forth herein.

98.     By engaging in the conduct described in paragraphs 38-79 above, Holzhueter and ISC in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly, employed devices, schemes and artifices to defraud.

99.     Defendants Holzhueter and ISC intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

100.    By reason of the foregoing, Defendants Holzhueter and ISC violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III
### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Holzhueter and ISC)

101.    Paragraphs 1  through 92 are realleged and incorporated by reference as though fully set forth herein.

102.    By engaging in the conduct described in paragraphs 38-79 above, Defendants Holzhueter and ISC, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

   a.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b.   engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

103.    Defendants Holzhueter and ISC made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

104.    By reason of the foregoing, Defendants Holzhueter and ISC have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT IV
### Control Person Liability Under Section 20(a) of the Exchange Act
### (Against Defendant Holzhueter)

105.    Paragraphs 1 through 92 are realleged and incorporated by reference as if set forth fully herein.

106.    Defendant ISC violated Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5(a) and (c)] thereunder as described in Count 38-79 above, which is incorporated by reference as if set forth fully herein.

107.    Holzhueter controlled the day-to-day affairs of ISC and possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of ISC. Holzhueter was involved in the formulation and execution of the fraudulent acts, misrepresentations and omissions by ISC described in paragraphs 38 through 79 above.

108.    Holzhueter directly or indirectly controlled ISC within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

109.    Holzhueter is liable as a control person for the violations by ISC of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

110.    Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Holzhueter is liable jointly and severally with and to the same extent as ISC.

## COUNT V
### (Relief Defendant Honefi)

111.    Paragraphs 1 through 92 are realleged and incorporated by reference.

112.    In June 2010, Holzhueter and ISC transferred investor funds for the benefit of Relief Defendant Honefi. These transfers were, in part, used to pay off Honefi's existing debt to a bank.

113.    In total, in June 2010, Honefi benefitted from ISC's transfer of at least $230,000 in investor principal.

114.    In addition, between April 21, 2009 and November 10, 2014, ISC made payments to Honefi – out of the accounts into which investor funds were comingled with other ISC revenue – totaling $166,350.

115.    The proceeds identified in paragraphs 113-114 are the proceeds of the violations committed by Defendants Holzhueter and ISC described in this Complaint.

116.    Relief Defendant Honefi has no legitimate claim to the amounts received from ISC identified in paragraphs 113-114, and therefore was unjustly enriched by receiving those funds.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Holzhueter and ISC, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants – and Relief Defendant Honefi – to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the Defendants' violative acts, practices and courses of business set

forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: */s/ Robert M. Moye*
Timothy S. Leiman (Leimant@sec.gov )
Robert Moye (Moyer@sec.gov)
Jennifer S. Peltz (PeltzJ@sec.gov)
Ariella O. Guardi (Guardia@sec.gov)

Chicago Regional Office
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*