IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Plaintiff,

  v.

ISC, INC., d/b/a INSURANCE SERVICE
CENTER, and THE ESTATE OF LOREN W.
HOLZHUETER,

                Defendants,

  and

HONEFI, LLC, ARLENE HOLZHUETER, and
AARON HOLZHUETER,

                Relief Defendants.

OPINION & ORDER

15-cv-45-jdp

---

The receiver has filed the proposed phase II distribution plan, Dkt. 299, which prompted several objections. The court will address those objections, and two additional motions, in this order.

**A. Objections to the phase II plan**

In the proposed phase II distribution plan, the receiver has identified eight creditor classes: (1) secured debt, (2) professional fees, (3) payroll and tax liabilities, (4) investor claims, (5) Kravit firm pre-receivership professional fees, (6) unsecured debt, (7) insider and indemnification claims, and (8) contingent/unliquidated/disputed claims. The first three classes—secured debt, professional fees, and payroll and tax liabilities—will recover at a rate of 100 percent. The next two classes—investor claims and the Kravit firm's pre-receivership

professional fees—will recover 85 percent. The receiver will pay approved but unsecured claims at a rate of 66 percent. Insider and indemnification claims and contingent/unliquidated/disputed claims will not recover at all. Estimated claims total just over $18.2 million; by the end of phase II, the receiver will have distributed just over $15.2 million.

Kravit, Hovel & Krawczyk does not object to its proposed payment. Dkt. 302. Contrary to the receiver's suggestion, the court had not previously ordered KHK to be compensated at the same rate as the investor class. The court limited KHK's recovery *in phase I* to a pro rata distribution commensurate with the investors' phase I recovery. The court had not determined KHK's status in during phase II. Nevertheless, no one objects to KHK's payment, and the court finds it reasonable under the circumstances, and it will approve the proposed distribution of $121,194.65 to KHK.

The court turns to the objections.

**1. Double Bubble**

Double Bubble, Ltd., objects to its classification as an unsecured creditor. Double Bubble contends that it perfected its security interest by filing a UCC financing statement with the Wisconsin Department of Financial Institutions, so the receiver should classify it as a *secured* creditor. Dkt. 304. But the receiver classifies Double Bubble as an unsecured creditor because its financing statement did not come up in the DFI records when he searched for financing statements using "ISC, Inc." as the debtor organization. As it turns out, Double Bubble filed its financing statement listing "ISC, Inc ." as the debtor, with a space between the final "c" and the "." Dkt. 306-1. The extra space was surely inadvertent, but it prevented the Double Bubble financing statement from showing up on a search of the accurate legal name of ISC, Inc.

A creditor must file a financing statement with the Wisconsin DFI to perfect its security interest. Wis. Stat. § 409.310(1). A financing statement is effective "even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." § 409.506(1). "[A] financing statement that fails sufficiently to provide the name of the debtor in accordance with s. 409.503(1) is seriously misleading." § 409.506(2). There is, however, a safety valve for the debtor's name. "If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with s. 409.503(1), the name provided does not make the financing statement seriously misleading." § 409.506(3). Put simply, § "409.506(3) creates a 'safe harbor' that will save a financing statement containing an incorrect name if a searcher can nonetheless find it in the ordinary course of a search." *In re Voboril*, 568 B.R. 797, 801 (Bankr. E.D. Wis. 2017). Unfortunately, the safety valve doesn't help Double Bubble. Given the search logic that the DFI uses, which is set out in Wis. Admin. Code DFI-CCS § 504(1), the extra space prevents the Double Bubble financing statement from coming up in a search using ISC's correct legal name.

The court has some sympathy for Double Bubble, because the additional space would be easy to overlook even if one were careful in filing the financing statement. And Double Bubble is correct that the receiver could have found its financing statement if he had used a different search, say a search simply for "ISC" with no punctuation or corporate designation. Double Bubble contends that such a search would have been "reasonably diligent." But reasonable diligence is not the current standard. *Voboril*, 568 B.R. at 802. "A primary purpose of the revision to the UCC 'was to replace the former reasonableness standard with a clearer

3

standard based on the computerized search logic of the filing office.'" *Id*. (quoting *In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 389 (Bankr. S.D. Fla. 2007)).

"Seriously misleading" is a term of art with a statutorily defined meaning: a search "under the debtor's correct name" must find the financing statement, otherwise it is seriously misleading. The fact that the DFI provides search "tips" and "hints" that might produce a broader set of results does not change the statutory standard. Double Bubble's objection is overruled. Double Bubble will participate in phase II as an unsecured creditor.

2. **T&J Liquidation**

Like Double Bubble, T&J Liquidation, Inc., objects to its status as an unsecured creditor. Dkt. 313. T&J contends that it has an enforceable security interest against ISC and that, as a result, it is a secured creditor. T&J and ISC executed a security agreement "to secure ISC's payment and performance of the indebtedness and obligations due" T&J. *Id.* at 2. The receiver classifies T&J as an unsecured creditor because it did not perfect its security interest before the court appointed the receiver. (The receiver was appointed on October 20, 2016; T&J filed its financing statement with the DFI on January 31, 2017.)

T&J has a security interest that would ordinarily be enforceable against ISC, but the failure to perfect that security interest affects T&J's ranking among ISC's creditors. As the receiver explains, T&J's "failure to take any action to perfect its security interest prior to the appointment of the Receiver exposed its claim to treatment as an unsecured claim in this matter." Dkt. 334, at 2. These proceedings demand difficult choices; not everyone will be made whole. The receiver may, in its discretion and in the interests of maximizing equitable recovery, subordinate unperfected security interests. The receiver has appropriately subordinated T&J's claim, and its objection is overruled.

### 3. Cowie Management Group

Early in this case, the court entered a temporary restraining order that required, among other things, that ISC and Honefi provide an accounting of their assets to the SEC. ISC engaged the Cowie Management Group and its principal, Martin J. Cowie, to assist with that accounting. (The court will refer to Cowie and his company together as "Cowie.") ISC incurred fees of $379,880, of which it paid Cowie $213,000. The receiver engaged Cowie—with the court's approval—to provide some additional services, which so far amount to $39,855.

Under the proposed phase II plan, Cowie's court-approved post-receiver fees are treated as professional fees and fully reimbursed. Cowie's outstanding balance for its pre-receiver work for ISC and Honefi is treated as an unsecured debt, to be compensated with ISC's other unsecured obligations at 66 percent of the principal balance. Cowie objects to the treatment of his pre-receiver work, which he argues should be treated like the post-receiver fees of the other court-approved professionals. Dkt. 326.

In brief summary, Cowie contends that his work for ISC was difficult because ISC's records were a mess, the SEC relied chiefly on his forensic accounting, and his work was thus critical to maximizing the recovery of the defrauded investors. So, he contends, on equitable grounds, he ought to be treated just like the court-approved professionals who worked for the benefit of the investors. The SEC is less enthusiastic about the value of Cowie's work, and it endorses the receiver's general approach to Cowie's fees, although it asks for further reductions of about $15,000 for certain inefficiencies. Dkt. 336. The receiver joins the SEC's response to Cowie's objection in full. Dkt. 338.

The court overrules Cowie's objection. His pre-receiver work was undoubtedly of some value to the SEC, and thus indirectly to the investors. But this work simply does not stand on

the same footing as that of the court-approved professionals who worked under the auspices of the receiver. Before the receivership, Cowie worked for ISC, at ISC's direction, and primarily in ISC's interest. The court sees nothing inequitable about treating Cowie as one of ISC's unsecured creditors, who will receive only a portion of the amount owed to them.

The SEC's criticism of Cowie's work is not unfounded; there are fees billed to ISC that might be more appropriately billed to Aaron or Arlene Holzhueter. But because the court has approved treating Cowie as an unsecured creditor who worked for ISC, not the receiver, the court will not second-guess ISC's decision to pay Cowie for these services. The court also declines to further reduce Cowie's fees on the basis of his assistance to parties adverse to the receiver in this case.

### 4. The state-court plaintiffs

The state-court plaintiffs reiterate their objections to the receivership, the sale of ISC, and the reimbursement plan. They argue that because they started their own lawsuits, they are not similarly situated to the other defrauded investors, and that because of their lawsuits they stand as creditors of ISC as well as defrauded investors. They ask that the court set aside a portion of the phase II assets—$1.8 million—to cover 66 percent of their projected state-court recoveries.

The SEC and the receiver ask that the court overrule the objection, on the grounds that the state-court plaintiffs are simply trying to obtain a grossly disproportionate share of a partial recovery. Dkt. 330. The court agrees, as it has already made clear. There is nothing inequitable about treating the state-court plaintiffs like the other defrauded investors. Their persistence has drained away resources that might otherwise be distributed to defrauded investors.

Nevertheless, the court will protect the interests of the state-court plaintiffs, and the other objectors, and allow them the opportunity to have their objections addressed on appeal. With one exception, the phase II distribution is stayed until the appeals conclude. The receiver may continue to petition for, and the court will continue to authorize, payment of quarterly professional fees, as provided under the receivership order.

**B. HBS's motion for payment of fees**

The law firm of Hurley, Burish & Stanton, S.C. (HBS) has represented Aaron Holzhueter in the six state-court cases. HBS asks the court to modify the phase II distribution plan to allow HBS to recover its unpaid attorney fees and costs, which total $135,845.84. Dkt. 314. HBS argues that under Wisconsin law, ISC is obligated to indemnify Aaron because he is an officer and director of ISC, and he is a defendant in the state-court suits simply because of his role in the corporation. Dkt. 318, at 6.

The receiver's proposed plan did not address HBS's claim because HBS is not a creditor of ISC. The SEC and the receiver oppose HBS's motion, Dkt. 335, as do the state-court plaintiffs, Dkt. 340. HBS is in a difficult spot: its client, Aaron, is in bankruptcy. Under ordinary circumstances, Aaron would have a claim for indemnification from ISC, assuming he did not breach his duty to the corporation. But these are not ordinary circumstances, and some of those who have claims against ISC are not going to get fully paid.

For several reasons, the court concludes that it is not inequitable to deny HBS's motion, leaving HBS to attempt to collect its fees from Aaron. First, Aaron waived all rights to any payment in this case. *See* Dkt. 335-1, at provision 2.b. (barring "Holzhueter . . . from obtaining or attempting to obtain any distributions, monetary relief, or property in this case"). Again, HBS is not a creditor of ISC; it is attempting to recover pursuant to *Aaron's* claim against the

7

ISC assets. So Aaron's waiver effectively halts its prospects of recovery. Second, HBS has an avenue to at least partial recovery in Aaron's bankruptcy, which would be the ordinary path to recover from a debtor. Third, Aaron's entitlement to indemnification is contingent and uncertain. As the state-court plaintiffs show, their state-court cases against Aaron are not predicated solely on his status as an officer and director of ISC, but on his active participation in the fraud. Aaron would not be entitled to indemnification if he breached his duty to ISC by violating criminal law, deriving an improper personal benefit, or otherwise engaging in willful misconduct. Wis. Stat. § 180.0851(2)(a).

The court agrees with the SEC and the receiver. Aaron himself (not HBS) might have had a right to indemnification under Wisconsin law, but he waived his right to recover from ISC in these receivership proceedings. And even if he hadn't waived, the claim for indemnification would belong to Holzhueter's bankruptcy estate. The court recognizes both the value in having Aaron represented in the state-court cases, and the difficulty HBS faces in getting paid for its work. But the receiver, and by extension the court, has to make tough choices in distributing ISC's scarce resources among the many virtuous claimants. Based on all the circumstances here, it is not inequitable to deny HBS recovery from ISC, leaving HBS to recover what fees it can from its client. The motion is denied.

**C. State-court plaintiffs' motion for reconsideration**

The state-court plaintiffs move the court to reconsider its decision to approve the sale of ISC and Honefi, in light of a recent Supreme Court decision. Dkt. 307. The court will deny the motion.

"On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . the judgment is void . . .

8

or . . . any other reason that justifies relief." Fed. R. Civ. P. 60(b)(4) and (6). According to the state-court plaintiffs, a recent Supreme Court decision, *Kokesh v. S.E.C.*, 137 S. Ct. 1635 (2017), limits disgorgement to the five-year period preceding suit. So the SEC overreached when it asked the court to liquidate ISC and Honefi without proving that it needed to liquidate the companies to penalize defendants for five-years' worth of violations, and the court's order approving the sale is void.

The court is not persuaded that *Kokesh* makes any difference here. First, it's not clear that the rule of law at issue is applicable. The *Kokesh* Court held that SEC disgorgement claims are subject to a five-year statute of limitations. The state-court plaintiffs do not explain why the *Kokesh* holding applies here, or why it would apply retroactively. Nor do they explain why they have standing to raise an *affirmative defense* (statute of limitations) that *defendants* have waived. Second, defendants settled with the SEC and voluntarily surrendered the assets subject to receivership, including ISC and Honefi. Third, "relief under Rule 60(b) is proper only under extraordinary circumstances," and "legal developments after a judgment becomes final do not qualify as extraordinary." *Hill v. Rios*, 722 F.3d 937, 938 (7th Cir. 2013). Here, the state-court plaintiffs say they challenge the court's order approving the sale, but the motion also implicates the consent judgments and defendants' decisions to surrender ISC and Honefi. The court will deny the motion.

**D. The receiver's motion for declaratory relief**

The receiver asks the court to declare certain rights under the asset purchase agreement between the receiver and AVID Risk Solutions, Inc., Tom Schwarz, and Family Insurance Center, Inc. (collectively, AVID). Dkt. 346. AVID purchased the assets of ISC under an Asset Purchase Agreement (APA) in a transaction with a closing date of May 31, 2017. The parties

9

dispute whether the purchase includes ISC's commissions on the so-called "straddling policies," and the receiver asks the court to declare that it does not.

The parties use the term "straddling policy" to describe policies purchased and in effect before the closing date with terms that extend after the closing date. Here, we are concerned with one subset of straddling policies: those where the insured pays the premium in installments over the course of the policy. ISC typically receives its full commission on the sale of a policy up front, even if the insured pays the premium in installments over the term of the policy. The basic structure of the APA is that AVID bought the assets of ISC, particularly its customer list, but it did not get the cash that ISC was holding. ISC's cash came, in large part, from the commissions that it had earned before the closing date. For the most part, ISC kept the commissions earned before the closing date; AVID got the commissions earned after the closing date. The dispute concerns a clause that creates an exception to this basic scheme.

In the terms used in the APA, AVID got the "Purchased Assets" but not the "Excluded Assets." The disputed provision provides:

> **Assets to be Purchased.** Subject to the terms and conditions set forth in this Agreement, the Purchaser agrees to purchase and the Receiver agrees to sell to Purchaser at the Closing (defined below), the Purchased Assets (defined below). As used herein, the term "**Purchased Assets**" means the Real Estate, and all assets of ISC, other than the Excluded Assets (defined below), which are primarily used in connection with the Business (collectively, the "**Business Assets**"). The Business Assets include the following:
>
> . . .
>
> (H) All commissions earned and recognized after the Closing Date with respect to the Business, and **any commissions earned and recognized prior to the Closing Date that constitute prepayments for insurance premiums due and payable after the Closing Date.**

Dkt. 347-1, § 1(H) (emphasis added). So the question is whether commissions earned on installment plan straddling policies fall within this last clause, so that they are not Excluded Assets, but Purchased Assets that belong to AVID.

AVID contends that under that last clause, it is entitled to certain commissions earned before the closing date for policies where the policyholder is paying the premium in installments *after* the closing date. For example, imagine a policyholder purchased a straddling policy through ISC on January 1, 2017, to cover the term from January 1 to December 31, 2017. Imagine the annual premium was $2,400. ISC would have received the full commission on the policy—say $240—on February 1, 2017. But the policyholder agreed to pay the premium in monthly installments over the term of the policy beginning January 1. AVID contends that it is entitled to 7/12 of the $240 commission, because seven monthly premium payments are due and payable *after* the closing date. As AVID reads the last clause, the $240 premium that ISC earned in January was a prepayment for premiums that were due and payable after the closing date.

The receiver disagrees, contending that the premium for an insurance policy is due and payable at the beginning of the term, regardless of the payment plan. Under the receiver's interpretation, the last clause applies only to policies that are prepaid before the closing date, but whose term begins after the closing date.

"The primary goal in contract interpretation is to 'give effect to the parties' intent, as expressed in the contractual language.'" *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 22, 326 Wis. 2d 300, 786 N.W.2d 15 (quoting *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426). When a contract's terms are clear and unambiguous, the court construes the contract as written. *Id.* ¶ 23. But when the contract's language is

11

ambiguous, the court may need to consider extrinsic evidence to determine the parties' intent. *Id.* "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 36, 363 Wis. 2d 699, 866 N.W.2d 679 (quoting *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 557 N.W.2d 67, 75 (1996)). Whether a contract is ambiguous is a question of law, for the court to answer. *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 24, 233 Wis. 2d 314, 607 N.W.2d 276.

Both parties contend that the contract language is unambiguous, and they advocate for their preferred interpretation. But AVID also adduces a lot of extrinsic evidence, which the court could consider only if the contract language is ambiguous. The receiver makes a good point that if AVID's interpretation of the APA were correct, one would have expected the APA to have provided a process by which the status of potentially straddling commissions were decided and the commissions belonging to AVID would be tabulated. It does not, which undermines AVID's plain language argument. But the intent of the parties is simply not ascertainable from the plain language of the agreement. The court concludes that the contract is ambiguous and that it must consider extrinsic evidence, and thus it will hold a hearing to resolve the ambiguity. The court will hold a telephonic status conference to schedule the hearing and an appropriate schedule for any needed pre-hearing discovery and briefing.

E. **Stay pending appeal**

The court authorizes the receiver's phase II distribution plan as discussed above. But the distribution will have to wait at least until the dispute over the APA is resolved, because that will affect the funds available for distribution. Regardless, as discussed, the court will stay distribution until the appeals conclude, with one exception. The receiver may continue to

petition for, and the court will continue to authorize, payment of quarterly professional fees, as provided under the receivership order.

The court will authorize the receiver to distribute the phase II assets (except for professional fees) only after the Seventh Circuit has decided any objector appeals.

ORDER

IT IS ORDERED that:

1. Double Bubble, Ltd.'s objection, Dkt. 304, is OVERRULED.

2. T&J Liquidation, Inc.'s objection, Dkt. 313, is OVERRULED.

3. Martin J. Cowie's objection, Dkt. 326, is OVERRULED.

4. The state-court plaintiffs' objection, Dkt. 319, is OVERRULED.

5. Hurley, Burish & Stanton, S.C.'s motion for attorney fees, Dkt. 314, is DENIED.

6. The court ADOPTS the receiver's proposed phase II distribution plan, Dkt. 299.

7. The state-court plaintiffs' motion for reconsideration, Dkt. 307, is DENIED.

8. The state-court plaintiffs' motion to stay, Dkt. 376, is WITHDRAWN as moot, per Dkt. 380.

9. The phase II distribution is STAYED pending appeal.

10. If the Seventh Circuit authorizes this court to authorize distribution of the phase II assets, the receiver will draft a proposed order for the court's signature that authorizes final phase II distributions. At that time, the receiver will also submit a short status report that tells the court what remains to be done in this case, if anything.

11. The receiver's motion for declaratory relief, Dkt. 346, is DEFERRED. The court will hold a telephonic status conference on Tuesday, September 5, 2017, at 10:00 a.m. to schedule an evidentiary hearing and an appropriate pre-hearing schedule. The receiver is responsible for setting up the call to chambers.

Entered August 30, 2017.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge